**UNITED STATES DISTRICT COURT**
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**RONALD WALKER,**

       **Plaintiff,**

**-vs-**                                       **Case No. 6:11-cv-273-Orl-28KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

       **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Ronald Walker, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 11, 12. This case was referred to me for issuance of a Report and Recommendation.[1]

**I. PROCEDURAL HISTORY.**

In May 2007, Walker applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.*, (sometimes referred to collectively herein as the Act). R. 102-07. He alleged that he became

---

[1] In the future, counsel should not state in a memorandum of law whether they consent or do not consent to disposition of a case by a Magistrate Judge. *See* Doc. No. 19 at 1. The Magistrate Judge should be informed through the proper consent form only if all parties consent to referral of a matter pursuant to 28 U.S.C. § 636(c).

disabled on March 30, 2007. R. 102, 105. Walker's applications were denied initially and on reconsideration. R. 46-53, 57-63.

Walker requested a hearing before an administrative law judge (ALJ). R. 70. An ALJ held a hearing on December 7, 2009. R. 29-45. Walker, represented by an attorney, testified at the hearing. Susanna Roche, a vocational expert (VE), also testified. R. 38-44.

After considering the testimony and the medical evidence presented, the ALJ determined that Walker was insured under OASDI through December 31, 2012. R. 14. The ALJ found that Walker had not engaged in substantial gainful activity since March 30, 2007, the alleged onset date of his disability. R. 14.

The ALJ concluded that the medical evidence showed that Walker had the following severe impairments: seizure disorder; history of left shoulder fracture; history of right ankle fracture; affective disorder; and anxiety-related disorder. R. 14. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings). R. 15-18.

The ALJ found that Walker had the residual functional capacity (RFC) to perform light work,[2] with the following exceptions: never climb ropes, ladders or scaffolding; avoid concentrated exposure to hazards such as dangerous machinery, unprotected heights, deep water and fire; moderately limited in the ability to carry out detailed instructions and to maintain attention and concentration for extended periods; moderately limited in the ability to complete a normal workday or workweek without interruption from psychologically-based symptoms; and moderately

---

[2] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567, 416.967.

limited in the ability to perform at a consistent pace without an unreasonable number or length of breaks.  R. 18.

Relying on the testimony of the VE and other evidence in the record, the ALJ concluded that Walker could not perform his past work as a construction worker but could perform the jobs of ticket taker, cashier or checker.  R. 22-23.  Therefore, the ALJ concluded that Walker was not disabled.  R. 23.

Walker requested review of the ALJ's decision.  R. 7.  On January 24, 2011, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 1-5.  Walker seeks review of this decision by this Court.  Doc. No. 1.

## II. JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III. STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3),1382c(a)(3)(D).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled

before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n. 2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## IV. STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are adequately set forth in the ALJ's decision and the parties' memoranda. Therefore, I will only summarize the relevant facts to protect Walker's privacy to the extent possible.

*A.    Personal Information and Work History.*

Walker was born in 1959. R. 31. He completed the twelfth grade. R. 32-33.

His prior work was in the field of construction. R. 37. The VE testified that Walker's prior construction jobs included: construction worker I, skill level of 4, heavy duty position; concrete mixing truck driver, skill level of 3, medium duty position; boiler house mechanic, skill level of 7, medium duty position; dump truck driver, skill level of 2, medium duty position; and welder fitter, skill level of 7, medium duty position. R. 39-40. Walker indicated that he was fired from his last job due to seizures. R. 34-35, 125.

*B.    Medical Records.*

Walker treated in an emergency room for a seizure on March 30, 2007. His Dilantin (seizure medication) level was low at 2.8.[3] He was diagnosed with an electrolyte imbalance and was prescribed Dilantin for the seizures. R. 248-52.

---

[3] A laboratory report reflects that the therapeutic range for Dilantin is 10.0 to 20.0. R. 252.

On June 13, 2005, an MRI of Walker's left shoulder showed prior surgery with metallic hardware in a satisfactory position and no evidence of any other abnormality. R. 275. An MRI of the right ankle indicated mild tendinosis, postoperative hardware, and a possible remote ankle sprain. R. 274, 276.

Walker treated with Miguel Burgos, M.D., at Integrated Health Center of America beginning on September 29, 2005. At that time, he complained of pain in his right ear and not being able to hear well. R. 258. On December 19, 2005, he complained of a cough. He was prescribed Xanax and Percocet. R. 257. On February 14, 2006, he was diagnosed with anxiety and back pain and his prescriptions were refilled. R. 270. On August 2, 2006, Phenytion (Dilantin) was added to his medications. R. 266.

On January 4, 2007, he was diagnosed with depression and his prescriptions continued to be refilled. R. 262. On February 1, 2007, a note indicated he needed treatment for seizures. R. 254, 320. Dr. Burgos continued to refill Walker's medications. R. 253, 259-61, 314-19.

Nancy S. Hinkeldey, Ph.D., completed a psychological examination on July 3, 2007. R. 279-84. Walker had been referred for mental status and memory testing. He reported seven or eight seizures in the past four to five years. He reported experiencing anxiety for seven years, but he had no symptoms of anxiety when he used his medication. He drank three beers every week or two. Walker put forth little effort during the assessment phase of the examination. His memory was adequate for recent and remote events despite reporting that he forgot a lot of things. R. 279-80. His judgment and insight were adequate and his intelligence was within normal limits. R. 281. During testing, Walker was uncooperative, impulsive, careless, and gave up easily on difficult tasks. R. 281. Test results showed Walker had impaired memory in the following areas: auditory

immediate, immediate memory, auditory delayed, visual delayed and general memory. He was borderline in visual immediate, auditory recognition and working memory. Dr. Hinkeldey deemed the test results to be invalid because Walker exerted poor effort and it appeared Walker may have exaggerated his cognitive difficulties. Dr. Hinkeldey diagnosed: anxiety disorder, not otherwise specified; history of alcohol dependence; and seizure disorder. R. 282. She indicated that Walker was able to do typical work at home and to care for his own hygiene. His social skills were likely adequate for employment. His functional ability appeared adequate and his anxiety was treated with good effect. R. 283.

Alex C. Perdomo, M.D., examined Walker on July 9, 2007. Walker complained of seizures and left shoulder pain. Walker reported having two to three seizures per year. He drank four to six beers per week. He had worked as a construction welder until four months prior when he had to quit due to left shoulder pain and having a seizure at work. R. 285. He had a normal mental status examination. Dr. Perdomo stated that Walker could benefit from physical therapy and a home exercise program for his shoulder. Walker was able to stand, walk and sit for eight hours in an eight-hour workday with normal breaks. He could frequently lift and carry but would be limited to no greater than thirty pounds with his left arm. Seizure precautions needed to be considered in his job restrictions. R. 286.

Suzanne Accordino[4] completed a Physical Residual Functional Capacity Assessment on July 18, 2007. R. 287-94. She found that Walker could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, sit and/or walk six hours in an eight-hour

---

[4] It appears that Accordino is likely a single decisionmaker, not a physician. There is no medical consultant's code on the form she completed. R. 294.

workday, with unlimited pushing and pulling. R. 288. He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl and should never climb ladders, ropes or scaffolds. R. 289. He should avoid concentrated exposure to hazards such as machinery and heights. R. 291.

Deborah Carter, Ph.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique form on July 23, 2007. R. 295-312. Dr. Carter opined that Walker was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 295-96. She noted he was able to understand, remember and carry out routine instructions and procedures. He could make basic decisions, concentrate, and complete things he started. R. 297. He had a mood disturbance, depression, an anxiety disorder and a history of alcohol dependence. R. 302, 304, 307. He had mild limitations in his activities of daily living, mild difficulties in maintaining social functioning and moderate restrictions in maintaining concentration, persistence or pace. R. 309.

Pamela D. Green, Ph.D., completed a Psychiatric Review Technique form on March 4, 2008. R. 321-34. She found that Walker had depression, an anxiety disorder and a history of alcohol dependence. R. 324, 326, 329. He had mild restrictions on his activities of daily living, mild difficulties in maintaining social functioning and moderate restrictions in maintaining concentration, persistence or pace. R. 331. In a Mental Functional Capacity Assessment, Dr. Green also found that Walker was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods. R. 335-36.

Violet Acero Stone, M.D., completed a Physical Residual Functional Capacity Assessment on March 18, 2008. R. 339-46. She found that Walker could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, sit and/or walk six hours in an eight-hour workday, with unlimited pushing and pulling. R. 340. He could frequently climb ramps and stairs, stoop and crouch and could occasionally climb ladders, ropes or scaffolds. R. 341. He should avoid concentrated exposure to hazards such as machinery and heights. R. 343. She indicated his symptoms were partially credible based on the objective evidence. R. 344.

Walker was treated by Billy Thompson, M.D., beginning at least by July 2008. R. 392. On July 9, 16 and 25, 2008, Dr. Thompson noted that Walker's Dilantin level was low. R. 349, 353-54, 392, 394-95, 398. A treatment note on a lab report dated July 17, 2008 indicates that if Walker was taking Dilantin, his dosage of the medication needed to be increased. R. 395. On August 16, 2008, his Dilantin level remained low at 5.49. R. 351-52, 399-400.

During 2008, Dr. Burgos continued to treat Walker monthly and refilled his prescriptions for Lorcet (narcotic pain medication), Xanax (anti-depressant/anti-anxiety medication) and Dilantin. R. 432-38. In August 2008, Dr. Burgos completed a questionnaire in which he indicated that Walker's condition did not permit work due to his seizures and side effects from the medications hydrocodone and Dilantin. His condition was permanent. R. 439.

In a physical examination on January 5, 2009, Dr. Burgos noted a history of seizures and back pain. R. 426-27. Walker treated monthly and refilled his medications with Dr. Burgos

through 2009. On November 2, 2009, Dr. Burgos appears to indicate that Walker's seizures were stable. R. 416.

On April 23, 2009, Dr. Thompson examined Walker. He noted that Walker reported that he had not had a seizure in more than one year. R. 401. Walker indicated he used marijuana and worried that he drank too much. R. 401, 404, 406. His Dilantin level was 3.6. R. 403. While Walker's test results continued to show low Dilantin levels, subsequent treatment notes from Dr. Thompson do not reflect that Walker was having seizures.

William W. Austin, Psy.D., evaluated Walker on July 6, 2009. R. 358-60. Walker reported being able to take care of his personal needs. During the day, he watched television, listened to music and took care of the dog. He did limited cooking, loaded the dishwasher and folded laundry. He went outside, to the grocery store and occasionally to church. His speech was relevant but slow and his thought processes were slow. His mood was depressed and his affect was blunted. Dr. Austin stated that his social functioning appeared limited based on limited social interaction. Dr. Austin also stated that his functional ability appeared limited based on depressive symptoms and physical health problems, which prevented him from working. R. 359. Dr. Austin diagnosed: anxiety disorder, not otherwise specified; major depressive disorder, single episode, moderate; alcohol abuse in early sustained remission; and seizure disorder by history. R. 359-60. He assigned a Global Assessment of Function (GAF) score of 50. R. 360.

On July 8, 2009, Sam Ranganathan, M.D., examined Walker at the request of the SSA. R. 361-64. Walker reported that he had not had a seizure after Dr. Thompson increased his dose of Dilantin more than six months previously. He did not have problems with his left shoulder because he was not working. He did laundry and sometimes took out the garbage, did a little yard work and

sometimes vacuumed and mopped. R. 361. Dr. Ranganathan diagnosed a history of seizure disorder and a history of left shoulder and right leg injuries. R. 362. Walker's Dilantin level was low at 5.1. R. 365.

Robert Steele, M.D., completed a Physical Functional Residual Capacity Assessment on July 20, 2009. R. 367-74. Dr. Steele found that Walker could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, sit and/or walk six hours in an eight-hour workday, with unlimited pushing and pulling. R. 368. He could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl and should never climb ladders, ropes or scaffolds. R. 369. He should avoid concentrated exposure to hazards such as machinery and heights. R. 371.

Jane Cormier, Ph.D., completed a Psychiatric Review Technique form on September 10, 2009. R. 375-88. She found that Walker's impairments were not severe. R. 375, 387. He had a depressive disorder, an anxiety disorder, and alcohol abuse in early remission. R. 378, 380, 383. He had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. R. 385.

In November 2009, Dr. Burgos wrote that Walker did not have heath care insurance and, therefore, he had no lab results, x-rays or clinical studies to send to Walker's attorney. R. 415.

    C.    *Claimant's Hearing Testimony and Disability Reports.*

Walker testified that he had a car accident in 2000 during which he hit his head. R. 33-34. He had operations on his left shoulder and right ankle during which rods and pins had been inserted. R. 33-34.

He began having seizures after the car accident. R. 34. Walker was inconsistent about the number of seizures he experienced. R. 34. In a disability report dated June 8, 2007, Walker

indicated that he had one seizure in the previous six months, and about seven seizures in the previous five to seven years. R. 152-53. In January 2008, he indicated that he had three seizures in December 2007 for which an ambulance was called[5], and that he had four seizures in the past six months. R. 177-78; *see also* R. 205.[6] At the ALJ's hearing, Walker ultimately testified that he was having one to two seizures a month each of which lasted from five to seven minutes. R. 34.

Walker testified that Dilantin and the seizures caused memory loss. Dilantin also caused forgetfulness, and he had trouble concentrating. R. 35. This testimony was inconsistent with a written disability report in which he did not report side effects from Dilantin. *See, e.g.,* R. 128-29.

Walker testified that he had difficulty following instructions. He had to write down items like measurements or he could not remember them. R. 36.

Walker lived with his mother. During the day, he helped her around the house. He cut the grass in the summer taking breaks as needed. It used to take him twenty-five to thirty minutes to finish cutting the grass but it now took an hour. R. 36.

Heat caused more frequent seizures. R. 36. His doctor told him not to drive and not to perform dangerous tasks such as climbing, welding or operating equipment. R. 37.

D.  *Vocational Expert Testimony.*

The ALJ asked the VE the following hypothetical question:

Now, he testified today that he only has a high school education, so let's go with a high school education, work experience as you have described. Assume that I find

---

[5] There are no medical records showing an ambulance call in December 2007.

[6] Walker's mother wrote in an disability report in February 2008 that she gave Walker his medication. She expressed concerns about Walker having seizures and indicated that his seizures had become more frequent. R. 181-87.

      that, from a non-exertional standpoint, his ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods are moderately limited; as well as the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods are moderately limited. Moderately limited is defined as a serious impairment in this area, but the person's still able to function satisfactorily. Then from an exertional standpoint, we have that he can lift and/or carry occasionally 20 pounds and frequently 10 pounds; he can stand and/or walk and/or sit six hours in an eight-hour workday on each position, and push and pull is unlimited. Functional limitations like climbing ladder, rope, scaffolds, never; and should avoid concentrated exposure working around hazards such as dangerous machinery, unprotected heights, deep water, fire. With these restrictions, would he be able to perform transferable work?

R. 41-42. The VE responded that this hypothetical person could not perform transferable work but that there was work available in the national economy that this person could perform. R. 42. He could perform the job of ticket taker, cashier II and checker I, all unskilled, light duty positions. R. 42-43.

## V.     ANALYSIS.

Walker asserts three grounds supporting reversal. First, Walker argues that the ALJ erred by failing to find that he would be unable to maintain employment because of his seizures. Second, Walker asserts that the ALJ did not consider opinions of professionals regarding his physical limitations in determining whether his condition met or equaled met Listing 11.02. Third, Walker contends that the ALJ failed to give proper weight to the opinion of Dr. Burgos in determining his RFC. These are the only issues I will address.[7]

---

    [7] The parties were advised that issues not specifically raised would be waived. Doc. No. 16 at 2.

     A.     *Maintaining Employment with Seizures*.

Walker contends that he cannot maintain any employment because of the risk he may have a seizure at any time and injure himself. He also contends that no employer will hire him because of the risk he will have a seizure at work and the liability involved.

As to the first argument, the record reflects that Walker engages in many activities of daily living despite his seizure disorder. He reported going out of the house, going shopping and occasionally going to church. R. 135, 145, 183, 359. He also performed housework including mowing the grass. R. 36, 134, 144, 182, 192, 359, 361. There is no indication that he has suffered injuries from these activities as a result of a seizure. Accordingly, Walker's argument that he is precluded from work due to the possibility of injury during a seizure is not supported by substantial evidence in the record.

As to the argument that no employer would hire him because of his seizures, social security regulations state that a claimant will not be considered disabled if his residual functional capacity and vocational abilities make it possible for him to do work which exists in the national economy but he remains unemployed because of the hiring practices of employers or because he would not actually be hired to perform work he could do. 20 C.F.R. §§ 404.1566(c)(3),(7), 416.966(c)(3), (7). Accordingly, even if no employer would hire Walker because of his history of seizures, that fact does not support a finding that he is disabled.

     B.     *Listing 11.02*.

Walker asserts that the ALJ erred in considering only the opinions of mental health professionals and failing to consider other doctors' opinions in determining whether he met Listing 11.02. Walker argues that his position is supported by *Logan v. Astrue*, Civil Action No. 2:10-cv-

110, 2011 WL 1002146 (S.D. Ohio Mar. 18, 2011). In *Logan*, the court held that the ALJ's determination that a claimant did not meet Listing 11.02 was not supported by substantial evidence because the ALJ relied on a reviewing physician's opinion that a claimant did not meet the listing without considering additional evidence and treatment after the reviewing physician rendered his opinion. This argument is inapplicable in the present case because, as discussed below, the ALJ rendered his decision based on a review of the record as a whole.

In his decision, the ALJ stated that he considered Walker's physical impairments as well as his mental disorders under the following categories of Listings: section 1.00 *et seq.*, Musculoskeletal; section 11.00 *et seq.*, Neurological; and 12.00 *et seq.*, Mental Disorders. R. 15. The ALJ also indicated that he gave "particular consideration to the claimant's physical impairments as well as his mental disorders." *Id.*

The ALJ went into great detail explaining his determination that Walker did not meet the Listings due to his mental impairments. He did not provide the same detail regarding Listings 11.00, *et seq.* An ALJ is not required to mechanically recite the evidence leading to his determination that a claimant did not meet a Listing. *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986). A finding that a claimant's impairments do not meet or equal a Listing may be implied from the ALJ's decision. *Id*; *see also Gray ex rel. Whymss v. Comm'r of Soc. Sec.*, No. 11-12839, 2011 WL 6091196, *2 (11th Cir. Dec. 8, 2011) (cited as persuasive authority) (court found that ALJ's determination could have been supported by evidence in the record despite ALJ not discussing the evidence).

Listing 11.02 requires a showing of documented seizures occurring more frequently than once a month in spite of at least three months of prescribed treatment. Listing 11.02's criteria can

be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02; Social Security Ruling (SSR) 87-6, 1987 WL 109184, at *3. Determination of blood levels of antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. *Id*.

The ALJ found that Walker's testimony about the number of seizures he experienced was not credible, and the medical records do not document seizures occurring more frequently than once a month. Additionally, the ALJ found that laboratory results showed that Walker's Dilantin levels were consistently below therapeutic levels. R. 20. These findings are supported by substantial evidence in the record. Based on these findings, the ALJ's conclusion that Walker's condition did not met or equal Listing 11.02 was not erroneous.

  C. *Dr. Burgos' Opinion*.

Walker asserts that the ALJ erred by failing to give substantial and controlling weight to Dr. Burgos' opinion that he is unable to work due to his seizures and side effects from his medications. Because Dr. Burgos was one of Walker's treating physicians, the ALJ was required to give substantial or considerable weight to his opinion unless good cause is shown to the contrary. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found where the treating physician's opinion was not bolstered by the evidence, was inconsistent with findings by other physicians or the treating physician's own records, or were merely conclusory. *Id.* (internal citations omitted).

The ALJ followed the applicable law. He indicated that Dr. Burgos' opinion "appears to indicate that the claimant's seizures were what precluded him from work. However, Dr. Burgos'

treatment notes are not supporting of his opinion with notations that claimant's seizures were stable." R. 21.

Substantial evidence supports the ALJ's conclusion. Dr. Burgos' notes are very short, and mainly reflect refilled prescriptions. *See, e.g.*, 253-71, 313-20, 416-25, 428-39. When Walker was examined, there was no documentation of the severity or frequency of Walker's seizures and no mention of side effects of medications. R. 426-27 (noting only seizures by history (Hx)). The ALJ correctly noted that Dr. Burgos appears to have written on November 2, 2009 that Walker's seizures were stable. R. 416.

Furthermore, the ALJ found that Walker's testimony about the number of seizures he experienced was not supported by the record, which findings are not challenged in Walker's memorandum. Among other things, the ALJ wrote as follows:

> The claimant testified that he experiences seizures "sometimes" 2 times monthly or 3-4 times in a 4-6 month period. When questioned by his representative, he agreed that he experiences seizures 1-2 times monthly. However, there is no indication in the medical record that the claimant has reported an increase in seizure activity. Rather, the claimant appears to report various degrees of frequency as to his seizures over the period at issue. In June 2007, the claimant reported 7 seizures in "5 or 6 or 7 years." At that time, he thought he had one seizure in the prior 6 months and 1 in the prior 3 months. . . . In January 2008, the claimant reported 3 seizures in December 2007 with 4 seizures in the prior 6 months. But, in April 2008, the claimant reported to Dr. Thompson that he had no seizures for more than one year. Interestingly, this would appear to cover the entire period since the alleged onset date of disability. And, in a review of systems in January 2009, no seizures, blackouts, numbness, or focal weakness was reported by the claimant. Dr. Burgos noted that the claimant's seizure disorder was "stable" in late 2009. And, in July 2009, the claimant reported that since his Dilantin had been increased 6 months prior, he had no further seizures. These inconsistent statements and reports, as well as the evidence that the claimant's Dilantin levels consistently tested at below therapeutic levels, tend to erode the claimant's credibility. Moreover, these consistencies must be viewed in conjunction with the claimant's apparent attempt at exaggeration of his cognitive difficulties during the consultative evaluation and his exaggeration of his physical limitations as shown in the report dated May 16, 2009.

R. 20 (internal exhibit citations omitted).

The ALJ also made detailed findings about functional limitations arising from mental impairments and side effects of medication, which findings Walker did not specifically challenge in his memorandum. *See* R. 19-20. The ALJ included functional limitations in his RFC finding to address the mental impairments and side effects of medication.

Accordingly, substantial evidence supports the ALJ's decision to give no weight Dr. Burgos' opinion that Walker would not be able to work due to seizures and side effects of medication.

## VI.  RECOMMENDATION.

For the reasons set forth herein, I recommend that the decision of the Commissioner be **AFFIRMED.** It is further recommended that the Court direct the Clerk of Court to issue a judgment consistent with its final order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 30, 2012.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy